IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

YOKAMON LANEAL HEARN,           §
                                §
                    Petitioner, §
                                §
VS.                             §  Civil Action No. 3:04-CV-0450-D
                                §
NATHANIEL QUARTERMAN, Director, §
Texas Department of Criminal    §
Justice, Correctional           §
Institutions Division,          §
                                §
                    Respondent. §

MEMORANDUM OPINION
AND ORDER

Petitioner Yokamon Laneal Hearn ("Hearn"), who is on death row

for capital murder, obtained permission from the Fifth Circuit to

file a successive habeas petition presenting the claim that he is

mentally retarded and that his execution is unconstitutional under

*Atkins v. Virginia*.[1]  *See In re Hearn*, 418 F.3d 444, 448 (5th Cir.

2005) ("*Hearn I*").  Following proceedings in this court, Hearn

filed "Petitioner's Report to the Court Concerning the Continued

Viability of His *Atkins* Claim" ("Report"), in which he concedes

that he "does not have significantly subaverage intellectual

functioning as measured by intellectual tests," Report 1, and that

"under the prevailing definition of mental retardation, he does not

have mental retardation," *id.* at 2.  He argues nonetheless that he

is entitled to habeas relief based on evidence that he suffers from

a "brain impairment [that] has produced a disability identical to

_____

[1]536 U.S. 304 (2002).

mental retardation in its disabling features, as those features were described in *Atkins*." *Id.* at 2. During oral argument of respondent's pending motions to dismiss or for summary judgment, Hearn shifted positions. He now argues that he *is* mentally retarded, although he maintains that he is entitled to make this showing through proof of brain impairment demonstrated by neuropsychological testing rather than by performance on Intelligence Quotient ("IQ") tests at a level that indicates mental retardation. Concluding that Hearn has not made the required showing of mental retardation to proceed on a successive habeas petition, the court dismisses his petition without reaching the merits.

I

A

Hearn and three accomplices abducted Joseph Franklin Meziere ("Meziere") from a car wash and drove him to a remote location, where Hearn murdered Meziere by shooting him several times in the head at close range. *See Hearn v. State*, No. 73,371, slip op. at 3 (Tex. Crim. App. Oct. 3, 2001) (en banc) (per curiam). Hearn was convicted of capital murder——murdering Meziere in the course of committing and attempting to commit the offense of robbery and kidnapping Meziere——and sentenced to death. *Id.* at 1. He appealed to the Texas Court of Criminal Appeals, which affirmed his conviction and sentence. *Id.* at 13. The Supreme Court of the

United States denied his petition for a writ of certiorari. *See Hearn v. Texas*, 535 U.S. 991 (2002).

While the appeal was pending in the Texas Court of Criminal Appeals, Hearn filed an application for a writ of habeas corpus in Texas state district court. The state habeas court recommended that all relief be denied. *See Ex Parte Hearn*, No. W98-46232-S(A) (Dist. Ct. of Dallas County, 282nd Judicial Dist. of Texas, Aug. 1, 2001). The Texas Court of Criminal Appeals thereafter denied relief in an unpublished order based on the state habeas court's findings and conclusions and its own review of the record. *Ex parte Hearn*, No. 50,116-01 (Tex. Crim. App. Nov. 14, 2001) (en banc) (per curiam).

Hearn then sought habeas relief in this court, which denied his petition. *Hearn v. Cockrell,* 2002 WL 1544815, at *11 (N.D. Tex. July 11, 2002) (Fitzwater, J.). The court later denied a certificate of appealability ("COA"). *Hearn v. Cockrell,* No. 3:01-CV-2551-D (N.D. Tex. Aug. 13, 2002) (Fitzwater, J.) (order). Hearn appealed and applied for a COA, which the Fifth Circuit denied, finding that he had failed to make a substantial showing of the denial of a constitutional right. *Hearn v. Cockrell*, 73 Fed. Appx. 79, 2003 WL 21756441, at *6 (5th Cir. June 23, 2003) (per curiam). The Supreme Court later denied Hearn's petition for a writ of certiorari. *Hearn v. Dretke,* 540 U.S. 1022 (2003).

Two days before his scheduled execution, Hearn filed a

successive application for state post-conviction relief, contending that he is mentally retarded and that his death sentence is cruel and unusual punishment under the Eighth Amendment. The next day, the Texas Court of Criminal Appeals dismissed Hearn's application, finding that he had failed to make a prima facie showing of mental retardation. *Ex parte Hearn,* No. 50,116-02 (Tex. Crim. App. Mar. 3, 2004) (en banc). Later that day, Hearn filed in this court a motion for appointment of counsel under 21 U.S.C. § 848(q)(4)(B), and for a stay of execution under 28 U.S.C. § 2251. This court *sua sponte* transferred the motions to the Fifth Circuit. Hearn appealed the transfer order and sought appointment of counsel and a stay of execution. The Fifth Circuit temporarily stayed Hearn's execution. *In re Hearn*, 376 F.3d 447, 450 (5th Cir.), *clarified on reh'g*, 389 F.3d 122 (5th Cir. 2004).

After briefing and oral argument, the panel granted Hearn's motion seeking appointed counsel to prepare an application for authority to file a successive federal habeas corpus petition. It also granted his motion for a stay of execution pending the disposition of the petition. *Id.* at 458. The panel later granted his motion under 28 U.S.C. § 2244(b)(2)(A) for an order authorizing the filing of a second habeas petition that presents the claim that, under *Atkins*, he is ineligible for execution because he is mentally retarded. *Hearn I*, 418 F.3d at 447-48. The Fifth Circuit recognized that Hearn could file a successive petition only if the

circuit court determined that he had made "a *prima facie* showing that (1) his claim ha[d] not previously been presented in a prior application to [the Fifth Circuit], (2) his claim relie[d] on a decision that stated a new, retroactively applicable rule of constitutional law that was previously unavailable to him, and (3) that he is mentally retarded." *Id.* at 444-45 (citing *In re Johnson,* 334 F.3d 403, 404 (5th Cir. 2003)). Because the State of Texas conceded that Hearn satisfied the first two requirements, the issue presented was whether Hearn had made a prima facie showing that he is mentally retarded. *Id.* at 445.

The panel held that "[a] *prima facie* showing of mental retardation is simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Id.* (quoting *Johnson,* 334 F.3d at 404 (brackets and internal quotation marks omitted)). It concluded that "[m]ental retardation is a disability characterized by three criteria: significant limitation in intellectual functioning, significant limitation in adaptive behavior and functioning, and onset of these limitations before the age of 18." *Id.* (citing American Association on Mental Retardation ("AAMR"), *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (10th ed. 2002)).

Hearn's motion relied on expert reports from Pablo Stewart, M.D. ("Dr. Stewart"), Mary Alice Conroy, Ph.D. ("Dr. Conroy"), and James R. Patton, Ed.D. ("Dr. Patton"). *Id.* Dr. Stewart's report

assessed Hearn for fetal alcohol syndrome ("FAS"); it did not address whether Hearn is mentally retarded. Dr. Stewart concluded, *inter alia*, that Hearn suffers from FAS, and he noted that mental retardation is a frequently occurring consequence of FAS. Dr. Stewart's report thus offered an explanation for the cause of Hearn's alleged mental retardation, but it neither diagnosed nor excluded mental retardation. *Id.*

Dr. Conroy's psychological evaluation addressed the first prong of the mental retardation diagnosis "to obtain an assessment of [Hearn's] general intellectual functioning." *Id.* "Dr. Conroy [made] no conclusions regarding whether Hearn is mentally retarded; her findings relate[d] only to Hearn's limitations in intellectual functioning." *Id.*

Dr. Patton interpreted Dr. Conroy's findings and determined that Hearn has significant limitations in intellectual functioning. Based on his own testing, he opined that Hearn has significant limitations in adaptive behavior and functioning. Dr. Patton determined that the onset of these limitations occurred before Hearn was 18. He concluded that in his professional opinion, based on the materials he reviewed, the test results obtained, and the key interviews, Hearn met the criteria of mental retardation, as defined by the AAMR. *Id.*

The panel rejected the State of Texas' argument that Dr. Patton's opinion was facially invalid and could not constitute a

prima facie showing of mental retardation because Dr. Patton is not a licensed psychologist and since Hearn had not presented proof that Dr. Patton is certified by Texas to diagnose mental retardation. The panel "decline[d] to conclude that Dr. Patton is not qualified to assess and diagnose mental retardation for the purposes of Hearn's *prima facie* showing." *Id.* After addressing and rejecting the arguments of the State of Texas and the dissenting panel member concerning Dr. Patton's lack of qualifications to render the opinion that Hearn is mentally retarded, *id.* at 445-47, the panel stated that it was "rel[ying] on Dr. Patton's report for the limited purpose of assessing whether Hearn ha[d] made a *prima facie* case of mental retardation——that is, whether he ha[d] raised questions of possible merit which justify further exploration below," *id.* at 447. The panel also rejected the parties' factual dispute over Dr. Patton's methods and findings that supported his opinion concerning Hearn's adaptive functioning. It stated: "We hold only that Hearn, through Dr. Patton's report and its incorporation of the reports of Dr. Stewart and Dr. Conroy, has put forth minimally sufficient evidence to make a *prima facie* case that he may be a person with mental retardation." *Id.* The panel then granted Hearn's motion for permission to file a successive petition for a writ of habeas corpus, finding that there was "minimally sufficient evidence" and that there was "sufficient, albeit slight, merit in Hearn's motion to warrant further

exploration by the district court." *Id.* at 447-48 (footnote omitted). In a footnote to this conclusion, the panel explained:

> Dr. Patton's report shows that Hearn barely meets the standard for significant limitations in intellectual functioning. On the AAMR's definition of mental retardation, significant limitations in intellectual functioning amount to performance on an appropriate assessment instrument that is approximately two standard deviations below the mean, taking into account the instrument's standard measurement error. On the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"), two standard deviations below the mean would amount to a score of 70. The measurement of error is approximately 5 points, so that a score of 70 represents a range of 65-75. On the WAIS-III administered by Dr. Conroy, Hearn obtained a Full Scale IQ of 74, a Verbal IQ of 73, and Performance IQ of 78. Dr. Patton, taking into account the measurement error for the WAIS-III, concludes that Hearn's scores "are in the IQ range that can be considered *approximately* two standard deviations below the mean of 100."

*Id.* at 447-48 n.4.

B

Based on the Fifth Circuit's decision in *Hearn I*, Hearn filed in this court a successive petition for habeas relief raising the claim that he is mentally retarded and that his execution is unconstitutional under *Atkins*. Respondent (the "state") answered and moved for summary judgment. Hearn replied to the answer and motion.

On September 12, 2006 the court set this matter for an evidentiary hearing beginning January 16, 2007. In preparation for the hearing, experts retained by the state conducted intelligence

testing on Hearn. On December 15, 2006 Hearn's counsel filed an unopposed motion to continue the hearing, citing "unexpected and unanticipated results in the intelligence testing." P. Mot. 1. Hearn's counsel maintained that they needed additional time to "conduct additional investigation into these test administrations and into the IQ level of Mr. Hearn." *Id.* The motion stated that "the investigation may lead to the conclusion that counsel for Mr. Hearn can no longer contend that he has mental retardation, thus averting the need for any hearing." *Id.*

On December 21, 2006 the court granted Hearn's motion for continuance. The court gave him 60 days to conduct additional investigation, and it specified that "no later than March 19, 2007, [his] counsel must report to the court and respondent's counsel whether the investigation has concluded and, if so, whether Hearn's *Atkins* claim is viable, or whether additional time for investigation is needed." Dec. 21, 2006 Order. At Hearn's request, the court enlarged the reporting deadline by 60 days.

On May 20, 2007 Hearn's counsel filed the Report, which states, in relevant part, that in November 2006, Hearn received a full-scale IQ score of 88 on the Wechsler Adult Intelligence Scale (3d ed.) and scored a 93 on the Stanford Binet Intelligence Scales (5th ed.). In April 2007 his full-scale IQ was measured by a defense expert as 87 on the Woodcock Johnson Tests of Cognitive Abilities (3d ed.). Report 1-2. Hearn acknowledges in the Report

that "under the prevailing definition of mental retardation, [Hearn] does not have mental retardation." *Id.* at 2.

Hearn nevertheless contends that executing him would be unconstitutional under the Eighth and Fourteenth Amendments. He maintains that he suffers from a "brain impairment [that] has produced a disability identical to mental retardation in its disabling features, as those features were described in *Atkins*." *Id.* Hearn reasons that "[t]he factual basis for his claim has changed but not in any manner that is *legally* significant." *Id.* He therefore relies on a "brain-impairment-based disability," *id.* at 3, and the rationale and logic of *Atkins* to contend that he cannot constitutionally be executed.

Hearn cites the Supreme Court's rationale in *Atkins* for concluding that it is unconstitutional to execute mentally retarded capital offenders, and he extrapolates these "foundational truths" to his "brain-impairment-based disability." *Id.* He relies on the Court's discussion of mentally retarded persons'

> diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others[,] . . . [and the] abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.

*Atkins*, 536 U.S. at 318. Hearn maintains that "[t]hese disabilities in the limitations in adaptive behavior that are

characteristic of mental retardation," Report 3, but he also posits that "these very same disabilities can be produced by brain impairments not associated with significant limitations in intellectual functioning[.]" *Id.* Hearn therefore cites evidence in his own life of "the significant limitations in adaptive behavior that the Supreme Court identified as characteristic of mental retardation," *id.* at 4: diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others and being followers rather than leaders in group settings.

Hearn contends that a recent evaluation by Dale G. Watson, Ph.D. ("Dr. Watson"), a Clinical and Forensic Neuropsychologist, demonstrates that these limitations in adaptive behavior stem from impairments in Hearn's brain. Although Dr. Watson concluded that Hearn's IQ "is above the cut-off score for mental retardation," *id.* at 7, he conducted neuropsychological testing in view of Dr. Patton's determination that Hearn has significant limitations in adaptive behavior that are characteristic of the limitations of mental retardation. Dr. Watson sought "to further understand Mr. Hearn's deficits in adaptive functioning in the face of IQ scores generally above the range associated with Mental Retardation/Intellectual Disabilities." *Id.* at 8 (quoting Exh. 1 at 2). Dr. Watson performed testing that "revealed 'mild

neuropsychological deficit' in the left hemisphere of Mr. Hearn's brain [that is] 'frequently associated with structural brain damage[.]'" *Id.* (quoting Exh. 1 at 2 & n.4). He opined that Hearn "does show evidence of brain-dysfunction." *Id.* (quoting Exh. 1 at 3). Based on the neuropsychological testing, Dr. Watson also made other findings concerning Hearn's limitations——none explicitly characterized as significantly subaverage intellectual functioning——that he found were the underlying cause of most limitations in adaptive behavior that Dr. Patton had identified. Significantly, Dr. Watson did not opine that Hearn is mentally retarded. Report Exh. 1 (Dr. Watson May 19, 2007 Letter) 1-4. And based on tests performed by Dr. Conroy, Randall Price, Ph.D., Thomas G. Allen, Ph.D., and himself, Dr. Watson "conclude[d] that Mr. Hearn's intellectual functioning falls above the range required by the first prong of the definition of mental retardation." *Id.* at 2; *see also id.* (referring to Hearn's "IQ scores generally above the range associated with Mental Retardation/Intellectual Disabilities").

Hearn contends that "[t]he deficits in [his] brain functioning correlate highly with the six areas of limitation relied on by the Supreme Court in *Atkins* to determine that people with mental retardation are less morally culpable and thus categorically not deserving of the death penalty." Report at 9. He relies on evidence that he contends shows his diminished capacities to

understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others and being followers rather than leaders in group settings. Hearn concludes that "[a]llowing [him] to proceed on his *Atkins* claim on the basis of brain impairment rather than significantly subaverage IQ is not far afield from the direction in which mental retardation scholars and practitioners are moving." *Id.* at 11. He maintains that under a proposed revised definition of mental retardation, he "has mental retardation." *Id.* at 13.

C

In reply to Hearn's Report, the state filed a combined response and motion for dismissal or, alternatively, motion for summary judgment. Hearn filed a response (denominated a reply) to the motion, and the state filed a reply brief (denominated as an answer re-urging its motion for summary judgment).

In its response and motion for dismissal or, alternatively, motion for summary judgment, the state maintains that the court lacks jurisdiction under 28 U.S.C. § 2244(b), a provision of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, to consider Hearn's claim because he is not mentally retarded; his claim fails on the merits because the state habeas court reasonably rejected Hearn's claim; Hearn's claim that brain impairment is the equivalent of mental retardation is unexhausted

and therefore procedurally barred; and his argument is illogical and would unlimit *Atkins*.[2]

On September 18, 2007 the court convened oral argument on the state's motion for summary judgment, as supplemented by its motion to dismiss or for summary judgment. In response to the court's questioning, Hearn's counsel shifted from his primary reliance on the premise that Hearn's brain impairment produces *Atkins*-type limitations in adaptive behavior that warrant habeas relief, and he retreated from the Report's concession that "under the prevailing definition of mental retardation, [Hearn] does not have mental retardation." Report 2. He attempted to focus instead on the contention that Hearn *is* mentally retarded under the Texas definition, although his mental retardation is evidenced by proof of impairments in brain functioning that are demonstrated by neuropsychological testing rather than by IQ test results.

II

The court need only decide whether Hearn has made a sufficient showing of mental retardation to satisfy the requirements of AEDPA

---

[2]Because the court concludes that Hearn has not made the threshold showing that he is mentally retarded, it need not consider the state's arguments that the state habeas court reasonably rejected Hearn's claim and that the claim that brain impairment is the equivalent of mental retardation is unexhausted and therefore procedurally barred. Nor need the court address the state's contention in a footnote in its reply brief that Hearn's claim for expanding *Atkins* to include offenders who are not mentally retarded would be barred by *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion).

for filing a successive motion and requiring that the court reach the merits of his *Atkins* claim.

A

The dispositive disputed element of the three-part test for filing a successive habeas petition under *Atkins* is whether Hearn is mentally retarded.[3]  Although the Fifth Circuit in *Hearn I* granted Hearn leave to file a successive petition after finding "minimally sufficient evidence" to support his claim of mental retardation and "sufficient, albeit slight, merit in Hearn's motion to warrant further exploration by the district court," *Hearn I*, 418 F.3d at 447-48, the circuit court's decision was merely the first of two gates through which Hearn must pass before the merits of his petition can be addressed.  When the Fifth Circuit grants such leave, the

> grant is, however, tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion.  The district court then is the second gate through which the petitioner must pass before the merits of his or her motion are heard.  The district court must conduct a thorough review to determine if the motion conclusively demonstrates that it does not meet AEDPA's second or successive motion requirements.

---

[3]In its response and reply, the state challenges Hearn's ability to satisfy the second and third elements.  The court need only address the third.

*In re Morris*, 328 F.3d 739, 741 (5th Cir. 2003) (per curiam) (internal quotation marks and citations omitted). "If [the Fifth Circuit] grant[s] the motion, the district court must conduct its own independent review of whether or not [the petitioner] has met the requirements of § 2244(b)." *In re Mathis*, 483 F.3d 395, 397 (5th Cir. 2007) (citing *Morris*, 328 F.3d at 741). "[T]he district court is free to reach its own conclusions on whether [the petitioner's] motion '"conclusively" demonstrates that it does not meet AEDPA's second or successive motion requirements.'" *Id.* at 399 (quoting *In re (Michael) Johnson*, 322 F.3d 881, 883 (5th Cir. 2003)). "The applicant bears the burden of demonstrating that the petition does in fact comply with the statute, and the district court shall dismiss the petition unless that showing is made." *Moore v. Dretke*, 369 F.3d 844, 845 n.1 (5th Cir. 2004) (per curiam) (citing 28 U.S.C. § 2244; *Brown v. Lensing*, 171 F.3d 1031, 1032 (5th Cir. 1999)).

B

The court holds that Hearn has not satisfied the requirements of 28 U.S.C. § 2244(b) because he has not made a sufficient showing—under the controlling definition of mental retardation—that he is mentally retarded.[4] In *Atkins* the Supreme

---

[4]In its response and motion, R. Resp. 10, and in its reply, R. Reply 4, the state relies on the finding of the Texas Court of Criminal Appeals that Hearn failed to make a prima facie showing of mental retardation to support its contention that Hearn has not made the prima facie showing that is required to bring a successive

Court did not define mental retardation. Instead, the Court left this decision to the states. *Atkins v. Virginia*, 536 U.S. 304, 317 (2002); *see also Hall v. State*, 160 S.W.3d 24, 36 (Tex. Crim. App. 2004) (en banc) (direct appeal) ("The Supreme Court left to the States the task of fashioning appropriate procedures for determining who is in fact mentally retarded[.]"). In *Ex parte Briseno,* 135 S.W.3d 1, 7 (Tex. Crim. App. 2004) (en banc) (habeas case), the Texas Court of Criminal Appeals adopted a definition of mental retardation.

> In the habeas context, we recently adopted temporary guidelines, to be used during the legislative interregnum, for determining whether a defendant is mentally retarded. Under these guidelines, a person is considered mentally retarded if he has these three characteristics: (1) significantly subaverage general intellectual functioning (an IQ of about 70 or below), (2) related limitations in adaptive functioning, and (3) onset of the above two characteristics before age eighteen.

*Hall*, 160 S.W.3d at 36 (citing and quoting *Briseno,* 135 S.W.3d at 7) (quotation marks and footnotes omitted)).

---

habeas petition. The state's reliance on the finding of the Texas Court of Criminal Appeals is misplaced, however, in the context of this court's determination as gatekeeper whether to allow a successive petition. "[T]he state court findings concerning the *Atkins* claim are wholly irrelevant to [the] inquiry as to whether [the petitioner] has made a prima facie showing of entitlement to *proceed* with his federal habeas application, which is an inquiry distinct from the burden that [the petitioner] must bear in proving his claim in the district court." *In re Mathis*, 483 F.3d at 397 (emphasis in original) (quoting *In re Wilson*, 442 F.3d 872, 878 (5th Cir. 2006)); *In re Henderson*, 462 F.3d 413, 415 (5th Cir. 2006) (per curiam) (same).

The Texas Court of Criminal Appeals adopted
two definitions of mental retardation in the
aftermath of *Atkins*, both of which contain the
same substantive elements. The first, the
AAMR definition, defined mental retardation as
a disability characterized by (1)
significantly subaverage general intellectual
functioning; (2) accompanied by related
limitations in adaptive functioning; (3) the
onset of which occurs prior to the age of 18.
The second, from the Texas Health and Safety
Code, requires significantly subaverage
general intellectual functioning that is
concurrent with deficits in adaptive behavior
and originates during the developmental
period. It is plain from the use of the words
accompanied by and concurrent that both of
these definitions require that all three
elements exist to establish mental
retardation.

*Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006) (quotation

marks and citations omitted) (quoting *Briseno,* 135 S.W.3d at 7)

(affirming denial of habeas relief sought through successive *Atkins*

motion).

Since the *Atkins* decision, Texas courts
addressing *Atkins* claims have followed the
definition of mental retardation adopted by
the AAMR and the almost identical definition
contained in section 591.003(13) of the Texas
Health & Safety Code. Under this standard, an
applicant claiming mental retardation must
show that he suffers from a disability
characterized by (1) significantly subaverage
general intellectual functioning, usually
defined as an I.Q. of about 70 or below; (2)
accompanied by related limitations in adaptive
functioning; (3) the onset of which occurs
prior to the age of 18. To state a successful
claim, an applicant must satisfy all three
prongs of this test.

*In re Salazar*, 443 F.3d 430, 432 (5th Cir. 2006) (per curiam)

(quotation marks and citations omitted) (denying leave to file successive *Atkins*-based habeas petition); *see also Taylor v. Quarterman*, ___ F.3d ___, 2007 WL 2372364, at *1 (5th Cir. Aug. 21, 2007) (denying certificate of appealability involving *Atkins* claim) ("A person is mentally retarded if he has (1) significant sub-average intellectual functioning; (2) accompanied by related limitations in adaptive functioning; and (3) onset prior to the age of eighteen.").

Hearn cannot show that he is mentally retarded because he admits in his Report that "under the prevailing definition of mental retardation, he does not have mental retardation." Report 2.[5] Hearn essentially seeks to supplement the first of the three required elements—which requires a showing of significantly subaverage intellectual functioning—with the option that a petitioner at least have a brain impairment that produces the same significant limitations in adaptive behavior that are discussed in

---

[5] In *Briseno* the Texas Court of Criminal Appeals recognized that "[p]sychologists and other mental health professionals are flexible in their assessment of mental retardation; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded." *Briseno*, 135 S.W.3d at 7 n.24. In his Report, however, Hearn concedes that he is not mentally retarded "under the prevailing definition of mental retardation." Report 2. Consequently, to resolve the ground that Hearn asserted in his Report for contending that he is entitled to *Atkins* relief, the court need not resolve whether Hearn should still be classified as mentally retarded under the Texas definition, despite IQ scores that are consistently well above 70.

*Atkins*.  *See id.* 2 (arguing that his "brain impairment has produced a disability identical to mental retardation in its disabling features, as those features were described in *Atkins*.").  Hearn's argument falls short, however, because *Atkins* left it to the states to define mental retardation.  The Texas definition——i.e., the "prevailing definition"——requires evidence of significantly subaverage intellectual functioning that Hearn cannot produce, even at the gatekeeping stage of the successive petition regimen.  Because all three elements of the definition must be met, *Clark*, 457 F.3d at 444; *Salazar*, 443 F.3d at 432, this failure is fatal to his claim.

The third element that an applicant must satisfy to obtain authorization to file an *Atkins*-based successive habeas petition is that he "is mentally retarded."  *Salazar*, 443 F.3d at 431 (citing *Hearn I,* 418 F.3d at 444-45).  What Hearn acknowledges to be the "prevailing definition of mental retardation" is in fact the definition that is used to determine whether a capital defendant has met this requirement.  The applicant must show that he "should be categorized as mentally retarded as defined in *Atkins* and *Penry v. Lynaugh*."  *In re Mathis*, 483 F.3d at 397 (quoting *In re Morris*, 328 F.3d at 740-41) (internal quotation marks, brackets, and some citations omitted).  In *Mathis* the panel stated that "[w]hether or not [the petitioner] has made a prima facie showing of mental retardation must be judged by the American Association on Mental

Retardation's ("AAMR") definition and associated factors." *Id.* at 397; *see also Woods v. Quarterman*, 493 F.3d 580, 585 (5th Cir. 2007) (stating that "[i]n response [to *Atkins*], [the Texas Court of Criminal Appeals] held that defendants and petitioners must establish their mental retardation, as defined by either the American Association of Mental Retardation (AAMR) or the Texas Health and Safety Code, by a preponderance of the evidence[.]" (citing *Briseno*, 135 S.W.3d at 7-8, 12)). The Texas standard, which also applies in the context of this court's role as second gatekeeper, unambiguously requires a showing of significantly subaverage intellectual functioning.[6]

Since the Texas Court of Criminal Appeals defined the meaning of "mental retardation" for purposes of evaluating *Atkins* claims,

_____

[6]Neither this court nor the case law suggests that IQ test scores provide the exclusive evidentiary basis on which to make this showing. In fact, *Hearn I* notes that, in *Briseno*, the Texas Court of Criminal Appeals catalogued a number of evidentiary factors that the trier of fact could consider, "including whether 'family, friends, teachers, employers [and] authorities' believed [the defendant] to be mentally retarded during the developmental stage, whether he responds 'coherently, rationally, and on point' to oral or written questions, and whether his 'conduct in response to external stimuli' is 'rational and appropriate.'" *Hearn I*, 418 F.3d at 446 (quoting *Briseno*, 135 S.W.3d at 8). But to support the argument that Hearn presents in his Report, he is not relying on non-IQ evidence to show that he is "mentally retarded" under the Texas definition. He is relying on this evidence to show that he has impairments in brain functioning that affect him *in the same way as mental retardation*, and that he has significant limitations in adaptive behavior *that are characteristic of mental retardation*. In other words, he is not attempting through non-IQ evidence to satisfy the Texas definition of "mental retardation," which he concedes he cannot meet.

the Fifth Circuit has in Texas capital cases adhered to the AAMR definition, and/or the "almost identical definition contained in section 591.003(13) of the Texas Health & Safety Code," *Salazar*, 443 F.3d at 432, in deciding whether to grant motions to file successive *Atkins* claims or to uphold the denial of *Atkins*-based habeas relief on the merits.[7] *See Woods*, 493 F.3d at 586-87 (affirming denial of *Atkins*-based habeas petition); *Mathis*, 483 F.3d at 397-99 (granting motion for leave to file successive habeas claim under *Atkins*); *In re Thomas*, 225 Fed. Appx. 222, 224-25 (5th Cir. 2007) (per curiam) (same); *In re Henderson*, 462 F.3d 413, 415-17 (5th Cir. 2006) (per curiam) (without explicitly discussing AAMR or Texas Health and Safety Code definition, adhering to *Hearn I* test for making prima facie showing of mental retardation and granting motion for leave to file successive *Atkins* claim where movant made prima facie showing under recognized three-part test); *Clark*, 457 F.3d at 444-46 (affirming denial of *Atkins*-based habeas petition); *In re Brown*, 457 F.3d 392, 396-97 (5th Cir. 2006) (denying motion for authorization to file successive habeas petition and stay of execution based, *inter alia*, on *Atkins*); *Moreno v. Dretke*, 450 F.3d 158, 163-65 (5th Cir. 2006) (denying

---

[7]This includes denying motions for certificates of appealability. Additionally, in *Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005), the panel relied on the AAMR and § 591.003(13) definitions in deciding whether petitioner's *Atkins* claim was unexhausted where he made a factually stronger showing of mental retardation in federal court compared to the one he made in state court. *Id.* at 496-98.

certificate of appealability where, *inter alia*, petitioner raised *Atkins* claim); *Salazar*, 443 F.3d at 432-34 (denying authorization to file successive habeas petition based on *Atkins* and noting, *inter alia*, that petitioner's "scores on two separate I.Q. tests are above the cutoff for mental retardation, which Texas recognizes as a score of 70 or below."); *Hearn I*, 418 F.3d at 445 (discussed *supra* at § I(A)) (granting application to file successive habeas petition and defining mental retardation according to AAMR definition).[8]  Hearn cannot demonstrate that his alternative formulation is sufficient to entitle him to proceed with an *Atkins* claim in a successive petition.

For the reasons stated, the court concludes that Hearn has failed to show that he is mentally retarded under the definition adopted in the state of Texas.  His habeas petition must be dismissed without reaching the merits because he has not satisfied AEDPA's requirements for prosecuting a successive motion that presents an *Atkins* claim.

---

[8]In *In re Woods*, 155 Fed. Appx. 132 (5th Cir. 2005) (per curiam), the panel granted authorization to file a successive *Atkins*-based claim without explicitly addressing the definition of mental retardation it was applying.  It did state, however, that it was authorizing a successive petition with respect to whether petitioner "is mentally retarded and therefore ineligible for the death penalty according to *Atkins*."  *Id*. at 136.  And there is no suggestion in the opinion that the panel was applying a definition of mental retardation that is different from the one that Texas has adopted.

Nor can Hearn establish that he is mentally retarded based on the new reasoning that he asserted at oral argument, i.e., that he *is* mentally retarded under the Texas definition.

As noted, in response to the court's questioning, Hearn's counsel shifted from relying primarily on the Report's argument that Hearn's brain impairment produces *Atkins*-type limitations in adaptive behavior that warrant habeas relief. He also receded from the Report's concession that "under the prevailing definition of mental retardation, [Hearn] does not have mental retardation." Report 2. Hearn's counsel contended that under the Texas definition of mental retardation, Hearn *is* mentally retarded, as evidenced by proof of impairments in brain functioning that are demonstrated by neuropsychological testing rather than by IQ test results.

Hearn's new approach to the claim that he is mentally retarded is unavailing. This is because even if the court assumes that Hearn's most recent IQ scores——which are all well above 70——do not alone defeat his claim of mental retardation, *cf. Hall*, 160 S.W.3d at 36 (referring to requirement of "significantly subaverage general intellectual functioning (an IQ of about 70 or below)"), Dr. Watson did *not* opine that Hearn is mentally retarded, and Hearn did not offer in his Report other new evidence that he is. Dr. Watson found that Hearn's "IQ scores [are] generally above the

range associated with Mental Retardation/Intellectual Disabilities." Report Exh. 1 at 2. In sum, Dr. Watson found that Hearn has a mild neuropsychological deficit in the left hemisphere of his brain; he has limited proficiency levels in intellectual functioning that are consistent with an 11-year-old; a review of the relevant materials, including Dr. Patton's evaluation, indicates that Hearn has significant deficits in adaptive functioning; the neuropsychological test findings reveal a pattern of strengths and weaknesses in Hearn's neuropsychological profile; Hearn has difficulty learning, limited academic skills, and limitations in verbal problem solving and problem solving abilities; and his neuropsychological deficits——which are likely developmental in nature——appear to underlie the findings of deficits in adaptive functions. Consequently, assuming that Hearn can rely on evidence of neuropsychological testing to establish mental retardation in the face of IQ scores materially above 70, he has simply failed to produce an opinion from Dr. Watson that he is mentally retarded.[9]

_____

[9]Additionally, although at oral argument and in the Report Hearn does not rely on the opinion of Dr. Patton that the Fifth Circuit found sufficient in *Hearn I* to constitute "minimally sufficient evidence" to support a prima facie showing of mental retardation, *Hearn I*, 418 F.3d at 447, the court concludes that Dr. Patton's opinion is insufficient, alone or in combination with the other evidence, to make the required showing of mental retardation. This is because after Dr. Patton rendered his opinion, Hearn took additional tests in which he consistently scored well above the IQ cutoff score. These scores materially undermine the bases for his opinion.

* * *

Accordingly, the court grants the state's May 29, 2007 motion for dismissal and dismisses Hearn's successive habeas petition.

**SO ORDERED.**

September 27, 2007.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE