# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **YOKAMON HEARN,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **No. 3:04cv00450-D** |
| | § | |
| **RICK THALER, Director** | § | |
| **Institutional Division, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| | § | |
| **Respondent.** | § | |
| _____ | § | |

---

## PETITIONER'S BRIEF CONCERNING THE
## COURT OF CRIMINAL APPEALS' RULING ON HIS
## SUBSEQUENT HABEAS CORPUS APPLICATION

---

### *Introduction and Statement of the Case*

On August 12, 2008, the Court stayed and abated Mr. Hearn's habeas corpus proceeding to permit him to present his *Atkins*[1] claim, as that claim had developed in the federal habeas proceeding, to the state courts.  Docket Item 107.  On April 28, 2010, the Court of Criminal Appeals dismissed Mr. Hearn's subsequent habeas corpus application on the merits because he was unable to support his claim of mental retardation with evidence of a full-scale IQ score of 75 or below, and, in the Court's view, such a score was necessary to support an *Atkins* claim.  *Ex parte Hearn*, 310 S.W.3d 424 (Tex.Crim.App. 2010).  Thereafter, the United States Supreme Court denied Mr. Hearn's petition for writ of certiorari as to this decision.  *Hearn v. Texas*, 543

---

[1] *Atkins v. Virginia*, 536 U.S. 304 (2002).

U.S. 960 (November 1, 2010). Counsel for Mr. Hearn file this brief to address the effect of the

Court of Criminal Appeals' decision on this Court's further consideration of Mr. Hearn's *Atkins*

claim.

## *Summary of the Argument*

"In *Atkins* the Supreme Court did not define mental retardation. Instead, the Court left

this decision to the states. *Atkins v. Virginia,* 536 U.S. 304, 317 (2002)." *Hearn v. Quarterman*,

2007 WL 2809908, at *7 (N.D.Tex. Sept. 27, 2007) (Fitzwater, J.) [*Hearn II*]. While this is an

accurate reading of *Atkins* as far as it goes, the Supreme Court did not by this delegation of

authority to the states intend to suggest that there is *no* limit to the states' discretion in

implementing *Atkins*. In *Schriro v. Smith*, 546 U.S. 6, 7 (2005), which struck down a Ninth

Circuit requirement that *Atkins* determinations be made in the state courts by juries, the Court

took care to note that other of the states' *Atkins* "measures might, in their application, be subject

to constitutional challenge." The Court of Criminal Appeals' determination in Mr. Hearn's case

that the subaverage intellectual functioning prong of mental retardation can be satisfied only by a

full-scale IQ score of 75 or less is a "measure[] ...[that is] ... subject to constitutional challenge."

*Smith*, at 7.

In deciding that the intellectual functioning element of mental retardation can be satisfied

only by full-scale IQ scores, the Court of Criminal Appeals turned a matter of fact into a

principle of law – a step that the Supreme Court carefully avoided in *Atkins*. While the definition

of mental retardation as involving three elements, subaverage intellectual functioning and

significant limitations in adaptive behavior manifested during a person's developmental period,

has remained the same in the mental health/disability professions for many years, the manner in

which these elements is established has for some time been and still is changing.  Indeed, at

present the leading association of mental retardation professionals acknowledges that in certain

cases the intellectual functioning element of mental retardation should be assessed by methods

*other than* full-scale IQ scores.  Thus, the Court of Criminal Appeals' turning one manner of

establishing the subaverage intellectual functioning element – a full-scale IQ score of 75 or

below – into a matter of law will cause arbitrary denials of *Atkins* claims in cases like Mr.

Hearn's where the intellectual functioning prong of mental retardation is more properly assessed

using alternatives to IQ scores, in keeping with the evolving principles underlying the clinical

definition of mental retardation.  For these reasons, the Court of Criminal Appeals' decision in

Mr. Hearn's case is in conflict with *Atkins*, and the decision cannot, therefore, be given deference

under 28 U.S.C. § 2254(d)(1).

## *Argument*

I.     **IN DELEGATING TO THE STATES THE RESPONSIBILITY TO DEVELOP APPROPRIATE WAYS TO ENFORCE THE BAN AGAINST EXECUTING PEOPLE WITH MENTAL RETARDATION, THE SUPREME COURT MADE CLEAR THAT THE MANNER IN WHICH THE STATES UNDERTAKE THIS TASK IS SUBJECT TO CONSTITUTIONAL RESTRAINT AND CHALLENGE.**

After concluding in *Atkins* that the Eighth Amendment forbids the execution of people

with mental retardation, the Court observed, "To the extent there is serious disagreement about

the execution of mentally retarded offenders, it is in determining which offenders are in fact

retarded."  536 U.S. at 317.  Rather than prescribing specific guidelines for the determination of

which offenders in fact have mental retardation, the Court decided to "'leave to the State[s] the

task of developing appropriate ways to enforce the constitutional restriction upon its execution of

sentences.'"  *Id*. (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-417 (1986)).

In directing the states to develop "'appropriate ways'" to enforce *Atkins*, the Court

obviously intended that *Atkins* procedures be consistent not only with its opinion in *Atkins* but

also with the Eighth Amendment and other applicable provisions of the Constitution.   Three

years after *Atkins*, the Court made this clear in a case in which the United States Court of

Appeals for the Ninth Circuit held that mental retardation determinations must be made by juries.

The Court overruled the Ninth Circuit, holding that the Constitution did not require that juries

make such determinations.  *Schriro v. Smith*, 546 U.S. at 7.  In doing so, however, the Court

made clear that there could be constitutional challenges to some state procedures:

> States, including Arizona, have responded to that challenge [the Court's direction
> to the states to develop *Atkins* procedures] by adopting their own measures for
> adjudicating claims of mental retardation.  *While those measures might, in their
> application, be subject to constitutional challenge*, Arizona had not even had a
> chance to apply its chosen procedures when the Ninth Circuit preemptively
> imposed its jury trial condition.

*Id*. (emphasis supplied).

Accordingly, Texas' procedure for determining which offenders have mental retardation

is subject to constitutional restraint and challenge.

## II.    UNTIL THE COURT OF CRIMINAL APPEALS' DECISION IN MR. HEARN'S CASE, NO CASE LAW REQUIRED THAT AN OFFENDER MEET THE FIRST PRONG OF MENTAL RETARDATION BY BY FULL-SCALE IQ SCORES

In *Hearn II*, this Court recognized that there was at that time no requirement in law, even

in Texas, that the subaverage intellectual functioning element of mental retardation had to

include full-scale IQ scores.  The Court explained:

> Neither this court nor the case law suggests that IQ test scores provide the
> exclusive evidentiary basis on which to make this showing.  In fact, *Hearn I* [the
> Fifth Circuit's preceding opinion on Hearn's *Atkins* claim] notes that, in *Briseno*,
> [135 S.W.3d 1 (Tex.Crim.App. 2004),] the Texas Court of Criminal Appeals

4

> catalogued a number of evidentiary factors that the trier of fact could consider, "including whether 'family, friends, teachers, employers [and] authorities' believed [the defendant] to be mentally retarded during the developmental stage, whether he responds 'coherently, rationally, and on point' to oral or written questions, and whether his 'conduct in response to external stimuli is 'rational and appropriate.'" *Hearn I,* 418 F.3d at 446 (quoting *Briseno,* 135 S.W.3d at 8).

2007 WL 2809908 at *9.

The Court went on to note in *Hearn v. Quarterman*, 2008 WL 679030 (N.D.Tex. March 13, 2008) (Fitzwater, C.J.) [*Hearn III*], that it appeared that the Court of Criminal Appeals explicitly did not require full-scale IQ scores to establish the intellectual functioning element:

> The court also rejects the state's contention that the "state law [is] that mental retardation begins with IQ's of 70 or below." Resp't Resp. 4. Texas courts have in fact held otherwise. Although noting that "significantly subaverage intellectual functioning is defined as an IQ of about 70 or below," the Texas Criminal Court of Appeals in *Briseno* explained that "[p]sychologists and other mental health professionals are flexible in their assessment of mental retardation; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded." *Briseno,* 135 S .W.3d at 7 n. 24. Although it is not clear on what other (non-IQ) basis the intellectual functioning prong can be established, or whether there is an IQ threshold above which a diagnosis of mental retardation is precluded, *Briseno* appears to suggest that clinical judgment, beyond strict adherence to IQ test results, can support a diagnosis of mental retardation. *See id.*

*Id*. at *4.

In its recent decision in Mr. Hearn's case, the Court of Criminal Appeals made clear, however, that IQ scores of 75 or lower *are* a necessary component of the subaverage intellectual functioning element:

> In making his *Atkins* claim, applicant asks this Court to significantly alter the current definition of mental retardation. Applicant correctly notes that the assessment of "about 70 or below" is flexible; "[s]ometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded." *[Ex parte] Briseno,* 135 S.W.3d [1] at 7 n. 24 [(Tex.Crim.App. 2004)](citing AAMD at 23)....

5

In the present case, applicant attempts to use neuropsychological measures to wholly replace full-scale IQ scores in measuring intellectual functioning. However, this court has regarded non-IQ evidence as relevant to an assessment of intellectual functioning only where a full-scale IQ score was within the margin of error for standardized IQ testing.

*Ex parte Hearn*, 310 S.W.3d at 430-31 (footnotes omitted). The court then held that "while applicants should be given the opportunity to present clinical assessment to demonstrate why his or her full-scale IQ score is within that margin of error, applicants may not use clinical assessment as a replacement for full-scale IQ scores in measuring intellectual functioning." *Id*. at 431.

## III. THE COURT OF CRIMINAL APPEALS' DECISION IS IN CONFLICT WITH *ATKINS* AND WITH THE EIGHTH AMENDMENT'S CONCERN THAT FACT-BASED DETERMINATIONS BE MADE RELIABLY

When it left to the states the responsibility for developing procedures implementing the *Atkins* decision, the Supreme Court added a footnote to this delegation of responsibility, observing that the states' "statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n. 3, *supra.*" 536 U.S. at 317 n.22.[2] Accordingly, the Court implied that the state courts should be guided by the clinical definitions of mental retardation as the basis for determining "which offenders in fact have mental retardation," 536 U.S. at 317, but plainly did not adopt those definitions as legal requirements.

By not adopting a specific definition of mental retardation, the Court's message to the state courts was clear: Determine which offenders in fact have mental retardation on the basis of

---

[2]The clinical definitions the Court referred to in footnote 3 of *Atkins* are the "similar," 536 U.S. at 308 n.3, three-part definitions adopted by the American Association on Mental Retardation (now renamed the American Association on Intellectual and Developmental Disabilities) and American Psychiatric Association, in which there must be significantly subaverage intellectual functioning and significant limitations in adaptive behavior manifested during the developmental period (prior to age 18).

the relevant evidence and the soundness of the science being applied by competing experts in each case, not on the basis of a process that turns scientific matters into rules of law that are then applied to individual cases.  The Court recognized that clinical and scientific principles are matters of fact, to be weighed and considered by the factfinder within the unique factual context of each case, and that courts should not turn such principles into rules of law.

Notwithstanding this admonition – modeled by the Court's decision in *Atkins* simply to reference the clinical definitions of mental retardation rather than to adopt those definitions as a rule of law – the Texas Court of Criminal Appeals in Mr. Hearn's case adopted a clinical principle as a rule of law and used it to preclude consideration of the merits of Mr. Hearn's *Atkins* claim.  This decision flatly violated the fundamental procedural prescription of *Atkins* and conflicts with the Eighth Amendment requirement that fact-based matters in capital cases be determined with a heightened concern for reliability.

A.     **In Reaching its Decision, the Court of Criminal Appeals Resolved a Legitimate Factual Dispute As a Matter of Law, Thereby Converting Its View of Clinical and Scientific Principles into a Rule of Law**

The Court of Criminal Appeals summarized the case presented by Mr. Hearn with respect to the subaverage intellectual functioning component of mental retardation as follows:

> The defense ... asked Dr. Stephen Greenspan to consider whether neuropsychological deficits such as those revealed by neuropsychological testing of applicant could satisfy the requirement of significantly subaverage general intellectual functioning, despite full-scale IQ scores ranging from 87 to 93.  Dr. Greenspan opined that substituting neuropsychological measures for full-scale IQ scores is "justified when there is a medical diagnosis of a brain syndrome or lesion, such as Fetal Alcohol Spectrum Disorder ... because it is well known that such conditions cause a mixed pattern of intellectual impairments that, while just as serious and handicapping as those found in people with a diagnosis of MR, are not adequately summarized" by full-scale IQ scores.  Dr. Greenspan concluded that, under a more expansive definition of mental retardation, applicant could establish a mental-retardation claim.

7

*Ex parte Hearn*, 310 S.W.3d at 430 (footnote omitted).  The court then rejected Mr. Hearn's

case, because  "applicants may not use clinical assessment as a replacement for full-scale IQ

scores in measuring intellectual functioning."  *Id*. at 431.

As we have noted in all of Mr. Hearn's pleadings from his Rule 59 motion forward, Dr.

Greenspan did not rely on a "more expansive" definition of mental retardation.  Rather, he

concluded that for a person like Mr. Hearn the *definition of mental retardation encompasses his*

*condition* even though his IQ scores are too high to meet the definition under ordinary

circumstances:

> [A] reasonable case can be made under existing diagnostic standards for saying
> that someone can meet the intellectual prong for a diagnosis of MR, even with a
> full-scale IQ in the 80's or even 90's.  This is because for individuals with a
> diagnosed brain syndrome, full-scale IQ can be, and usually is, highly misleading.
> In a syndrome such as Fetal Alcohol Spectrum Disorder, one typically finds a
> mixed pattern, with areas of relative strength combined with areas of severe
> impairment.  Such a mixed pattern provides an overall full-scale IQ score that can
> be very misleading, in that it masks the true extent of the individual's limitations
> in learning and in other areas of adaptive functioning, including social
> vulnerability.  The admonition to clinicians to exercise 'clinical judgment,'
> spelled out in both AAMR-10 and its companion USER'S GUIDE, requires a
> clinician to not just be a reporter of test scores but to evaluate the extent to which
> such test scores can be relied on validly in any particular case.  Such an exercise
> of clinical judgment allows a qualified psychologist such as Dr. Watson, to
> conclude that an individual with a documented brain disorder meets the AAMR-
> 10 and DSM 4-TR criteria for diagnosing MR, even in the face of IQ above 70-75.

Petitioner's Motion Pursuant to Rule 59(e) to Vacate Judgment, Exhibit 2 at 14 (Docket Item

100) [hereafter, Rule 59 Motion].

Though some experts might disagree with Dr. Greenspan and Mr. Hearn's other experts,

there is substantial support for Dr. Greenspan's view in the scientific literature.  Notwithstanding

the Court of Criminal Appeals' determination that "clinical judgment can[not] completely

replace full-scale IQ scores in measuring intellectual functioning," *Ex parte Hearn*, 310 S.W.3d at 430, the newest manual from AAMR – now American Association on Intellectual and Developmental Disability (AAIDD) – instructs otherwise: "It must be stressed that the diagnosis of ID[3] is intended to reflect a clinical judgment rather than an actuarial determination." AAIDD 2010 at 40. Because of this, AAIDD recognizes that there are some situations "in which personal characteristics or environmental factors result in formal assessment that is less than optimal due to its unreliability, invalidity, incompleteness, and/or inappropriateness." *Id.* at 97. In these situations – "when information obtained from formal assessment instruments does not validly answer the question asked due to lack of opportunity, lack of appropriately normed tests, significant functional limitations of the person, contradictory information, and/or cultural and linguistic factors," *id.* – the clinician is encouraged to employ an alternative assessment strategy, which utilizes, *instead of formal assessment with instruments such as IQ tests*, direct observation[4] and evaluation of social competency.[5] *Id.* This is precisely what Dr. Greenspan concluded was necessary in Mr. Hearn's case, because IQ testing with people who have a fetal alcohol disorder "can be, and usually is, highly misleading." Rule 59 Morion, Exhibit 2 at 14.

Thus, the Court of Criminal Appeals, latching on to part of the science underlying the

---

[3]Mental retardation is now denominated "intellectual disability" rather than mental retardation, but it is the same disability. *See* AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Support* 1 (11th ed. 2010) [hereafter "AAIDD 2010"]. Because *Atkins* used the term "mental retardation," we will continue to use it here.

[4]"[D]irect observation should focus heavily on functional systems assessment (i.e., what the person actually does and how the person interacts with his or her environment, with an emphasis on adaptive behavior)." *Id.*

[5]"In the evaluation of social competence, the focus should be on whether or not the person accurately interprets others' emotions and intentions on the basis of available clues; generates appropriate social strategies in response to social problems; and demonstrates knowledge of social scripts and schemes, such as anticipating the consequences of carrying out different strategies for resolving particular social problems in a given social context." *Id.* at 97-98.

diagnosis of mental retardation – the need generally to use formal assessment instruments like IQ

tests in evaluating intellectual functioning, *rejected* the scientific principles that set out

exceptions to the *very principle* embraced by the court.  In so doing, the court pulled a rule of law

out of a set of scientific principles that already contradict the rule of law and that are in flux, all

of this without the benefit of a hearing and findings by a factfinder.  That the Court of Criminal

Appeals did this in the face of its previous recognition in *Briseno* that the science underlying

mental retardation is constantly evolving[6] provides singular emphasis to the unreasonableness of

the court's ruling.

The Supreme Court of California, in *People v. Superior Court (Vidal)*, 40 Cal.4th 999,

155 P.3d 259 (Cal. 2007), recognized the error in such a judicial process and avoided making it,

casting light on how unreasonable the Court of Criminal Appeals' application of *Atkins* is in

*Hearn*.

**B.** **The California Supreme Court's Refusal to Take the Approach of the Court of Criminal Appeals in a Similar Case Underscores How the CCA's Approach in *Hearn* Is a Stark Deviation from *Atkins***

In *Vidal*, the subaverage intellectual functioning prong of the *Atkins* claim rested on full-

scale IQ scores as high as 92 and as low as 77 – but none 75 or below.  155 P.3d at 261.  Vidal's

---

[6]In *Briseno*, the Court of Criminal Appeals recognized that the science underlying mental retardation was constantly "in flux" and that the importance of *Atkins* could significantly encourage this evolution:

> The social sciences definition of mental retardation has been in a state of flux for over 65 years, as evidenced by the definitions dating from Tredgold (1908, 1937) and Doll (1941, 1947) to the current AAMR 10th edition definition.  Mental Retardation:  Definition, Classification, And Systems of Support 19 (10th ed.2002).  *See State v. Williams,* 831 So.2d 835, 838 n. 2 (La.2002) (noting that "there is current dissatisfaction with the term 'mental retardation,' but there has been no consensus on a substitute term").  Given the importance and impact of *Atkins* upon the criminal justice and the mental health and mental retardation systems, that definitional flux may well continue.

135 S.W.3d at 8 n.29.

verbal IQ scores[7] ranged from 59 - 70, with only one, a 77, being higher than 75.  *Id*.  His

performance IQ scores ranged from 96-126.  *Id*.  Because of the large discrepancy between verbal

and performance scores, the defense experts concluded, with support from the science of mental

retardation, that the full-scale scores were not the best measure of Vidal's intellectual

functioning.  *Id*. at 262.  They also concluded that his verbal scores were more important to

understanding his limitations in adaptive behavior, so they urged the court to find that Vidal's

"severe difficulty in processing verbal information demonstrated subaverage intellectual

functioning originating in childhood."  *Id*.

> The prosecution expert, on the other hand,

> disagreed.   In his view, the Wechsler test's "best estimate of general intelligence,
> that is to say the overall intelligence, is [Full Scale IQ]."  General intelligence
> "refers to a person's overall abilities, not some splinter skill ... or one isolated
> weakness in intellectual abilities." [He] believed that [one of the defense experts],
> by relying heavily on the Verbal IQ scores, "invites us to look at one weakness
> without understanding that there is a great and ameliorative strength."

*Id*. at 263.

> The trial court accepted the defense expert's analysis of the IQ scores:

> His "very low scores in terms of verbal I.Q.," ... demonstrated a significant deficit
> in his "ability to process information and handle it adequately and to think
> logically."...  The court further observed that Verbal IQ was particularly relevant
> in applying *Atkins* because "[w]e are talking about issues of premeditation,
> deliberation, appreciation of concepts of wrongful conduct, ability to think and
> weigh reasons for and not for doing things and logic, foresight, and all of those are
> related to verbal I.Q."

*Id*.  Having found that Vidal's evidence also established significant limitations in adaptive

---

[7]Full-scale IQ scores on the Wechsler series of IQ tests are composed of two subscales – verbal and performance, which in turn are composite scores of a number of individual sub-tests.  *See generally* 155 P.3d at 261-62.

11

behavior and that his disability manifested before the age of 18, the trial court dismissed death as

a possible sentence.  *Id.*

On the state's interlocutory appeal to the California Court of Appeal, the court agreed

with the prosecution expert's position.  As the Supreme Court explained,

> The Court of Appeal sided squarely with [the prosecution expert] in this debate
> over psychological standards, stating flatly that "general intellectual functioning is
> primarily determined by the defendant's FSIQ score."  Like the psychologists who
> testified at the hearing, the lower court majority cited scientific sources
> (references published by the American Psychiatric Association and the American
> Association on Mental Retardation) rather than legal authority in support of its
> view.

*Id.* at 267.

The California Supreme Court reversed, because the Court of Appeal converted a factual

dispute into a rule of law.  As the court explained,

> The Court of Appeal majority erred in thus purporting to resolve a *factual*
> question – the best scientific measure of intellectual functioning – *as a matter of
> law.*  In finding the facts of a particular case, courts and juries untrained in science
> are sometimes called upon to resolve contested scientific issues, but such factual
> findings do not establish generally applicable rules of law.  The superior court
> here, for example, found on the basis of [defense experts] Couture's and
> Widaman's testimony that in Vidal's case his Full Scale IQ scores in the low
> average to average range did not preclude a finding of mental retardation.  In a
> given case an appellate court might, within its proper role, hold that such a finding
> was not supported by substantial evidence in the hearing record.  But an appellate
> court cannot convert a disputed factual assertion into a rule of law simply by
> labeling it a "legal standard," as the Court of Appeal purported to do here....
>
> The question of how best to measure intellectual functioning in a given case is
> thus one of fact to be resolved in each case on the evidence, not by appellate
> promulgation of a new legal rule.

*Id.* at 267 (footnote omitted).

The approach in *Vidal* illuminates the unreasonableness of the Court of Criminal

Appeals' decision in *Hearn*.  The Supreme Court was plainly reluctant in *Atkins* to turn a fact-based matter such as the determination of mental retardation into a set of legal principles.  The *Vidal* decision demonstrates why:  The determination whether a specific person has mental retardation has to be made on the facts of each case, where there is often conflicting scientific testimony.  The resolution of "contested scientific issues ... do[es] not establish generally applicable rules of law," *Vidal*, 155 P.3d at 267, because any particular resolution is case-specific and can come out differently from one case to another.  *Id*.  *Atkins* in effect warned against this process, yet the Texas Court of Criminal Appeals has now embraced it.

### C.    The Court of Criminal Appeals' Decision in *Hearn* Risks Unreliable Determinations of Whether Specific Offenders Have Mental Retardation

In *Ford v. Wainwright*, 477 U.S. 399 (1986), the Supreme Court addressed the determination of a defendant's incompetence at the time of execution, a fact-driven decision that, like the determination of mental retardation, exempts a defendant from execution.  The Court noted the "heightened standard of reliability" that the Court demands for fact-finding in capital cases, *id.* at 411, and continued:

> [I]f the Constitution renders the fact or timing of [a defendant's] execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being....  Indeed, a particularly acute need for guarding against error inheres in a determination that in the present state of the mental sciences is at best a hazardous guess however conscientious....  That need is greater still because the ultimate determination will turn on a finding of a single fact, not on a range of equitable considerations.

*Id.* at 411-12 (internal quotes and citation omitted).

The determination of whether an offender has mental retardation may not be quite as "hazardous [a] guess," *id.*, as a determination of competence to be executed.  However, because

the life or death of a human being depends on it, there is nevertheless "a particularly acute need

for guarding against error," *id.*, in making this determination.  The best way to guard against

error is to let the fact-finding process work at it is supposed to:  to allow "courts and juries

untrained in science ... to resolve contested scientific issues," *Vidal*, 155 P.3d at 267, on the basis

of the evidence presented, *not* to channel the fact-finding process through requiring the

application of a particular scientific principle which does not apply in every case.  The latter is

what the Court of Criminal Appeals' ruling in Mr. Hearn's case has done, and it is recipe for

erroneous rather than reliable decision-making.

IV.    *EX PARTE HEARN* CANNOT BE GIVEN DEFERENCE UNDER 28 U.S.C. § 2254(D)(1)

Pursuant to 28 U.S.C. § 2254(d)(1),

An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to any
claim that was adjudicated on the merits in State court proceedings unless the
adjudication of the claim--

(1)    resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the
Supreme Court of the United States....

As demonstrated here, the Court of Criminal Appeals' decision in Mr. Hearn's case is

"contrary to," *not* simply an "unreasonable application of," *Atkins*.  An unreasonable application

arises if a state court decision "correctly identifies the governing legal rule but applies it

unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407-

08 (2000).  What happened here is that the Court of Criminal Appeals did not even correctly

identify the governing legal rule.  It flouted that rule, as it was expressed in *Atkins*, and the

consequences of its ruling risk unreliable decisionmaking, contrary to the Eighth Amendment-

14

based rule that requires the most reliable factfinding process possible in capital cases.

### Conclusion

For these reasons, the Court cannot give any deference to the Court of Criminal Appeals'
decision in Mr. Hearn's case.  Having previously determined that Mr. Hearn's *Atkins* claim in its
current form states a *prima facie* case, *Hearn III*, 2008 WL 679030 at *4, and now, with the
showing that the state court's recent decision cannot be given deference, the Court should
proceed to hold an evidentiary hearing on Mr. Hearn's claim.

Respectfully submitted,

Richard Burr                           Naomi Terr
Burr and Welch, PC                     Texas Defender Service
2307 Union Street                      1927 Blodgett Street
Houston, TX 77007                      Houston, Texas 77004
(713) 628-3391                         (713) 222-7788
(713) 893-2500 (fax)                   (713) 222-0260

s/ Richard Burr
Counsel for Petitioner

### Certificate of Service

I, Richard Burr, hereby certify that the foregoing brief was served on the Attorney
General for the State of Texas, Counsel for Respondent, by providing electronic service through
ECF on January 10, 2011, addressed to: Georgette.Oden@oag.state.tx.us.

s/ Richard Burr
Counsel for Petitioner