IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| YOKAMON LANEAL HEARN, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 3:04 CV 0450-D |
| | § | *CAPITAL LITIGANT* |
| RICK THALER, | § | Hon. Sidney A. Fitzwater |
| Director, Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

RESPONDENT THALER'S RESPONSE
TO HEARN'S BRIEF CONCERNING THE
COURT OF CRIMINAL APPEALS'S RULING ON HIS
SUBSEQUENT HABEAS CORPUS APPLICATION

Petitioner Yokamon Hearn (Hearn) was properly convicted of, and
sentenced to die for, murdering Frank Meziere during the course of a felony.
Hearn has previously and unsuccessfully challenged the constitutionality of his
Texas capital murder conviction and death sentence in both state and federal
courts. Hearn was then granted authorization to file a second petition, in which
he challenged his conviction and sentence in this Court pursuant to Atkins v.
Virginia.[1] This process was stayed and abated to permit Hearn to return to
exhaust his claim in the state courts. Upon his return to this Court, however,

---

[1]      536 U.S. 304 (2004).

1

he has failed to demonstrate that he is entitled to relief or to a hearing. The Director renews his pending Motion for Summary Judgment.

## PETITIONER'S ALLEGATION

Hearn asks this Court to disregard the American Association of Mental Retardation (AAMR) definition of mental retardation, which was adopted by Texas for use in these proceedings, and expand the term "mentally retarded" to include persons with normal IQ scores. Brief, ECF No. 119, at 3; Ex parte Briseño, 135 S.W.3d 1, 18 (Tex.Crim.App.2004); Hall v. State, 160 S.W.3d 24, 36 (Tex. Crim. App.2004) (en banc). This is entirely different from his position in the successive petition for writ of habeas corpus, where he claimed to be retarded under the AAMR definition, and even different from his position before this Court on May 20, 2007. At that time, Hearn filed a report where he candidly acknowledged he is not retarded, but has a "brain impairment [that] has produced a disability identical to mental retardation in its disabling features." Pet. Report (Report), ECF No. 87, at 2. Having had little success with these first two iterations, Hearn attempts a third version that claims he is retarded if one "change[s] the operational criteria one uses to diagnose MR, in order to meet the spirit of the constitutive definition. . .". Pet. Mot. Vacate Judgment, ECF No. 100, at 4. In this successive federal habeas proceeding, Hearn alleges that his execution is precluded by the Eighth Amendment's prohibition against the

2

execution of the mentally retarded.  Hearn contends that despite full-scale IQ scores in the upper 80s and lower 90s, he is mentally retarded because some mental health professionals think it would be more fair to allow people of normal intelligence, with adaptive behavior deficits caused by brain damage, to be diagnosed with mental retardation so that they can avoid the death penalty. Pet. Mot. Vacate Judgment, ECF No. 100, at 4-7.  He thus asks this Court to decline to give deference to the Court of Criminal Appeals's dismissal of his writ and to hold an evidentiary hearing.

## STATEMENT OF THE CASE

In 1998, Hearn was convicted of capital murder and sentenced to death in the 282nd Judicial District Court of Dallas County, Texas.  The Court of Criminal Appeals affirmed Hearn's conviction and sentence in an unpublished decision on October 3, 2001.  Hearn v. State, No. 73,371 (Tex. Crim. App. 2001). Subsequently, the Supreme Court denied Hearn's petition for writ of certiorari. Hearn v. Texas, 535 U.S. 991 (2002).  On November 14, 2001, the Texas Court of Criminal Appeals adopted the trial court's findings of fact and conclusions of law, and denied Hearn's state petition for writ of habeas corpus.  Ex Parte Hearn, No. 50,116-01 (Tex. Crim. App. 2001) (unpublished).

This Court denied Hearn's first petition for federal writ of habeas corpus and also denied a certificate of appealability (COA). Hearn v. Cockrell, No. 3:01-

CV-2551-D (N.D. Tex. July 11, 2002).  The Fifth Circuit also denied Hearn's request for COA.  Hearn v. Dretke, No. 02-10913, (5th Cir. 2003).  On November 17, 2003, the Supreme Court denied Hearn's petition for writ of certiorari.  Hearn v. Dretke, 540 U.S. 1022.  The State of Texas scheduled Hearn's execution for March 4, 2004.

On March 2, 2004, Hearn filed a successive application for state postconviction relief, claiming that he is mentally retarded and that his death sentence is cruel and unusual punishment under the Eighth Amendment.  See Atkins v. Virginia.  On March 3, 2004, the Court of Criminal Appeals denied Hearn's application on the ground that it failed to make a prima facie showing of mental retardation.  Ex parte Hearn, No. 50,116-02 (Tex. Crim. App. 2004).[2]  Later that day, Hearn moved this Court for appointment of counsel pursuant to 21 U.S.C. § 848(q)(4)(B), and for a stay of execution under 28 U.S.C. § 2251.  This Court sua sponte transferred the motions to the Fifth Circuit, and Hearn filed a separate notice of appeal asking the Fifth Circuit to reverse the transfer order, appoint counsel, and enter a stay of execution.  In order to thoroughly address Hearn's claim, the Fifth Circuit granted a temporary stay of execution, requested supplemental briefing, and heard oral argument.

---

[2]      The Fifth Circuit construed the state court's order as a dismissal as an abuse of the writ under Texas Code of Criminal Procedure Art. 11.071, Section 5.  In re Hearn, 376 F.3d 447, 450 (5th Cir. 2004)(Hearn I).

On July 6, 2004, the Fifth Circuit granted Hearn's motions for appointment of counsel and for a stay of execution because Hearn had made "a colorable showing of mental retardation" and because he had demonstrated "rare and exceptional circumstances" that would entitle him to equitable tolling of the statute of limitations. Hearn I, 376 F.3d at 450-58. The Court then denied rehearing on October 19, 2004. Hearn II, 389 F.3d 122 (5th Cir. 2004). Hearn was afforded funding for investigation and expert assistance. Subsequently, he filed a motion for authorization to file a successive writ in the Fifth Circuit. On July 20, 2005, the Fifth Circuit granted Hearn's motion for authorization, noting however, only "slight merit to warrant further exploration." In re Hearn, 418 F3d 444, 447 (5th Cir. 2005) (Hearn III). On that same day, Hearn filed his successive writ in this Court.

The Director responded with an Answer and Motion for Summary Judgment on May 2, 2006. ECF No. 46. This Court ordered an evidentiary hearing to be held during the week of January 16, 2007. Order, ECF No. 51. On December 21, 2006, the Court postponed the hearing, at Hearn's request, to permit him to conduct further investigation and to report, no later than March 19, 2007, "whether the investigation has concluded and if so, whether Hearn's Atkins claim is viable, or whether additional time for investigation is needed." Order, ECF No. 79. On March 28, 2007, this Court granted Hearn two more

months to continue investigating his Atkins claim.  Order, ECF No. 83.  Hearn

filed his status report on May 20, 2007, in which he conceded that he is not

mentally retarded.  Report, ECF No. 87.  This Court held that Hearn had not

made a showing of mental retardation as is required to proceed on his successive

habeas corpus petition.  Mem. Op. and Order, ECF No. 98.  Hearn then filed a

Motion to Vacate the Judgment which included two new expert reports.  Pet.

Mot. Vacate Judgment, ECF No. 100.  After reviewing them, this Court stayed

the federal proceedings in August 2008 to permit Hearn to return to state court

and exhaust his claim.  Mem. Op. and Order, ECF No. 107.

Hearn filed a successive writ of habeas corpus in the Court of Criminal

Appeals, which was dismissed on the merits because he could not support his

claim with IQ scores of 75 or below.   Ex parte Hearn, 310 S.W.3d 424

(Tex.Crim.App. 2010).  The Supreme Court denied Hearn's petition for writ of

certiorari.  Hearn v. Texas, 543 U.S. 960 (2010).  Hearn filed briefing on the

effect of the state court's ruling, including a request for an evidentiary hearing,

in this Court on January 10, 2011, and this response timely follows.  Brief, ECF

No. 119.

STATEMENT OF FACTS

I.      Facts of the Crime

Evidence admitted at trial established that on March 25, 1998, Hearn and three others drove to North Dallas for the express purpose of making some money. The group carried with them two shotguns, a .22 caliber pistol, and a Tec-9 automatic. At approximately 10:30 p.m. the group observed Frank Meziere preparing to wash his 1994 Mustang at a coin-operated car wash. Hearn devised a plan to steal the car and instructed his accomplices how to proceed. Hearn and his companions abducted Frank Meziere at gunpoint and drove him to a secluded location where Hearn used the Tec-9 to shoot Meziere. Meziere died as the result of multiple close-range gunshot wounds to the head. Hearn then drove away in Meziere's Mustang in search of a "chop shop" for stolen cars. A city electrician discovered Meziere's body in a roadside field early the next morning. Two hours later a patrol officer discovered Meziere's abandoned Mustang in a shopping center parking lot.

II.     Punishment Evidence

A.      Evidence presented by the State

The State offered extraneous offense evidence regarding Hearn's future dangerousness including the burglaries of four habitations, an arson, an aggravated robbery, an aggravated assault, a sexual assault, a terroristic threat

combined with unlawful carrying of a weapon, a criminal trespass to steal a bicycle, and a schoolyard assault over another bicycle. See 43 RR[3] 11-14, 29-32, 40-42, 49-50, 64, 76-82, 101-03, 114-20, 125-30; 44 RR 28-32, 45-51, 54-58.

B.     Evidence presented by the Defense

Hearn's father (Tony Lee Massingill) was incarcerated until Hearn was approximately five years old and later died of leukemia. 44 RR 93, 131. He was deceased at the time of Hearn's trial. 44 RR 131. When Hearn's father was incarcerated, his maternal grandfather willingly assumed the role of father figure and maintained a close relationship with Hearn. 44 RR 93-95, 122-23, 132-34. Hearn's maternal grandfather died in 1985 of cancer. 44 RR 94-95. Hearn's maternal grandmother died in 1991. 44 RR 91.

Hearn's mother was only eighteen when he was born in 1978, but she managed to maintain a stable life and raise Hearn with the help of her mother and father . 44 RR 130-34. For the most part Hearn's mother's life was "pretty stable." 44 RR 134. In 1991, following the death of Hearn's maternal grandmother, Hearn's mother started using drugs. 44 R 97-98, 135. Hearn was approximately twelve years old. 44 RR 96-97, 134. Hearn's aunt described his condition in 1991 while in his mother's care as "somewhat neglected, but he

---

[3]     "RR" stands for the Reporter's Record, the transcript of events during the trial, preceded by the volume number and followed by page number(s).

hadn't lost any weight, you know, where he wasn't eating." 44 RR 99. Hearn's mother testified she did the best she could, but admitted she was not the mother she should have been. 44 RR 144-45.

Hearn's extended family assumed his care and his maternal aunts ultimately assumed the role of guardian while his mother was on drugs. 44 RR 98-103, 106-07, 115-20, 122, 134-39. After his maternal aunt Pearlie Mike assumed his care, "She took care of Yokamon. It was nothing — he didn't want for anything: food, clothes, nothing." Hearn's aunt was "a fine lady" who did her best for him. 44 RR 99.

After several years, Hearn left his Aunt Pearlie's house to be with his mother who was living in a shelter, after which he spent approximately two to three weeks in custody of Child Protective Services (CPS). 44 RR 105, 140-41.

Hearn's aunt Wanda Ross-Bell then took him in while his mother was in rehabilitation. She provided for him as if he were one of her own sons and made sure he went to school. 44 RR 106-07, 118. She encouraged him to get an education and a job. 44 RR 110-11. When he applied himself to his studies, Hearn did well, but he was moody and did not want to do his assignments. 44 RR 108. Ross-Bell described him as "a follower" who "tries to be like other people." 44 RR 109. Hearn left Ross-Bell's home when he turned eighteen. By that time, she was sure he knew right from wrong. 44 RR 118-19. In addition

to Wanda Ross-Bell and his mother, several other members of his family were present at his trial.  44 R 126-27.

While incarcerated in the county jail awaiting trial, Hearn committed minor jail infractions such as being out of his bunk when he was supposed to be in bed and stealing lunch trays from other inmates.  44 RR 153.

III.   Atkins Proceedings In State Court

A.   Evidence presented by Hearn

During successive state habeas corpus proceedings Hearn presented school transcripts from Dallas Independent School District (DISD), and State of Texas Academic Achievement Records from Fort Worth Independent School District (FWISD).  In addition, he supplied the evaluations and reports of several mental health and medical professionals, including Dr. Stephen Greenspan, Dr. James Patton, Dr. Dale Watson, Dr. Mary Alice Conroy, and Dr. Pablo Stewart.  These doctors concluded that Hearn suffers from Fetal Alcohol Syndrom, neurological deficits, and adaptive behavior deficits which qualify him for a diagnosis of mental retardation.

B.   State's evidence refuting Hearn's mental retardation claim

The State's evidence consisted of more of Hearn's records from DISD, as well as records from CPS, the Texas Department of Criminal Justice (TDCJ), and Tarrant County Juvenile Services.  The State also submitted Hearn's pro se

10

clemency petition, filed on February 11, 2004. In addition, the State submitted

testing and reports from its experts, Dr. Thomas Allen and Dr. Richard Hughes,

who concluded that Hearn is not mentally retarded and in fact is of near-normal

intelligence.

## ARGUMENT

I.  **Hearn's Atkins claim fails on the merits because the state court reasonably rejected Hearn's claim.**

This petition cannot be granted because it was adjudicated on the merits

in state court proceedings. Federal relief is only permissible if the claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As the Supreme Court recently reemphasized in Harrington

v. Richter:

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

The reasons for this approach are familiar. "Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." It "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority."

Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions. Under the exhaustion requirement, a habeas petitioner challenging a state conviction must first attempt to present his claim in state court. 28 U.S.C. § 2254(b). If the state court rejects the claim on procedural grounds, the claim is barred in federal court unless one of the exceptions to the doctrine of Wainwright v. Sykes applies. And if the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to § 2254(d) set out in §§ 2254(d)(1) and (2) applies. Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding.

131 S.Ct. 770, 786-87 (2011)(internal citations omitted). Hearn does not contend that the state court unreasonably interpreted the facts, which are undisputed, or that it unreasonably applied clearly established federal law. Instead, he complains that its decision was "contrary to" clearly established federal law in violation of § 2254(d)(1). Brief, ECF No. 119, at 14.

12

A.    Atkins and the Eighth Amendment require states, not individual factfinders, to define mental retardation.

Hearn claims that the Texas court's decision was contrary to Atkins because it "did not even correctly identify the governing legal rule," but he declines to express exactly what the omitted rule is.  Id.  He expressly waives any claim that the state court's decision was an "unreasonable application" of Atkins.  Brief, ECF No. 119, at 14.[4]

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meanings. Bell v. Cone, 535 U.S. 685, 694 (2002).  Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts.  Brown v. Payton, 544 U.S. 133, 141 (2005); Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless

---

[4]    Nor could he.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 129 S.Ct. 1411, 1413-14 (2009).

arrives at a result different from our precedent.'").

A state court's failure to cite governing Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" Mitchell, 540 U.S. at 16. However, the Court of Criminal Appeals clearly relied on, and followed, the Supreme Court's precedent, citing Atkins in its first sentence and on nearly every page thereafter. Ex parte Hearn, 310 S.W.3d 424.

Hearn candidly admits that Atkins left to the states, not the factfinders, to determine which offenders were mentally retarded and, of those, which offenders were within the class about whom there is a national consensus. Brief, ECF No. 119, at 2; Atkins, 536 U.S. at 317. Thus, he cannot claim there is any clearly-established Supreme Court definition of mental retardation to be misapplied for his contrary-to argument. When Atkins specifically defers to the states, a state's definition of mental retardation cannot be contrary to "clearly established law" unless the state court categorically says that mentally retarded (MR) offenders are eligible for the death penalty. Nor could it be said that the Texas court reached a contrary conclusion on a set of materially indistinguishable facts, since there were no facts considered in Atkins which was remanded for a factual determination. Id. at 321.

14

Hearn insists that "[b]y not adopting a specific definition of mental retardation, the [Supreme] Court's message to the state courts was clear . . [it] recognized that clinical and scientific principles are matters of fact, to be weighed and considered by the fact finder . . . and that courts should not turn such principles into rules of law." Brief, ECF No. 119, at 6-7. To the contrary, while Atkins does not mandate a particular definition of mental retardation, neither does it insist that states leave it to juries and trial courts to define retardation anew in each separate instance. It says nothing about "matters of fact" and "rules of law," language Hearn pulls from a California appellate court opinion addressing a different circumstance. People v. Superior Court (Vidal), 155 P.3d 259, 267 (Cal.2007).[5] Plainly the enforcement of the Eighth Amendment's restrictions requires standards for determining who is mentally retarded. Nothing in Atkins mandates that the definition itself tracks the medical trends du jour, or worse, be articulated differently in each separate case according to the opinions of the experts involved.

The Fifth Circuit has already dismissed Hearn's contention that Atkins

---

[5] In Vidal, the California Supreme Court found that the lower court erred in its interpretation of the California Penal Code section which defined retardation for capital punishment purposes in "purporting to resolve a factual question—the best scientific measure of intellectual functioning—as a matter of law." 155 P.3d at 265-267. In Hearn's case, however, the Texas legislature has yet to define retardation and therefore the state's highest court is defining retardation by default. Ex parte Hearn 310 S.W.3d at 427-428.

creates clearly-established federal law regarding the process for determining, or the content of, a state's definition of mental retardation.   Clark v. Quarterman,  457 F.3d 441, 445 (5th Cir. 2006).   Clark raised a challenge to Briseño's[6] approach on IQ scores, and the Fifth Circuit held that Atkins permits states a substantial amount of leeway in determining how retardation is defined and how it shall be proved.  "Although the [Atkins] Court did refer to the clinical definitions of mental retardation promulgated by the [American Association on Mental Retardation] and the [American Psychiatric Association], it did not dictate that the approach and the analysis of the State inquiry must track the approach of the AAMR or the APA exactly. . . Therefore it is not 'clearly established Federal law as determined by the Supreme Court of the United States' that state court analysis of subaverage intellectual functioning must precisely track the AAMR's recommended approach."  Id.

Given the nature of psychological ailments, their diagnostic criteria, and the Supreme Court's delegation of authority on the issue to the states, it follows that the state court is entitled to leeway in putting the mandate into effect. Atkins, 536 U.S. at 317 (citing Ford v. Wainwright, 477 U.S. 399, 405, 416-17 (1986)); see also Briseño, 135 S.W.3d at 8 (noting "[s]ome might question whether the same definition of mental retardation that is used for providing

---

[6]       135 S.W.3d 1 (Tex.Crim.App.2004).

psychological assistance, social services, and financial aid is appropriate for use in criminal trials to decide whether execution of a particular person would be constitutionally excessive punishment").  Because of the general nature of the Supreme Court's pronouncement in Atkins, state courts will be accorded greater leeway in executing the directive, as the Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

Yarborough v. Alvarado, 541 U.S. 652, 663-64 (2004).  This was reiterated in Harrington v. Richter, 131 S.Ct. at 786, as well as Renico v. Lett, 130 S.Ct. 1855, 1864 (2010).

In conclusion, the closest the Atkins Court ever comes to a pronouncement of what the definition should be occurs immediately before footnote 22:

> As was our approach in Ford v. Wainwright with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."

536 U.S. at 318 (citations omitted).  Atkins explicitly locates the authority for articulating the definition of retardation in the State, not the individual factfinder.  This is precisely what the Court of Criminal Appeals has done in

deciding the manner in which proof of mental retardation must be presented to the court.

> B.    Texas's decision to require proof of subaverage IQ scores makes sense, and is not subject to review by this Court absent Constitutional infirmity.

A federal habeas court must defer, not to trends in the mental health community, but to state court interpretation of state law questions.  Reddix v. Thigpen, 805 F.2d 506, 511 (5th Cir. 1986); Weeks v. Scott, 55 F.3d 1059 (5th Cir. 1995).  The Supreme Court left it up to the states to define mental retardation for themselves.  The highest court in Texas decided, in lieu of action by its legislature, that one cannot be considered 'mentally retarded' if one has IQ scores above "about 70."  The Court of Criminal Appeals has held that "the 'about 70' language of the AAMR's definition of mental retardation . . . represent[s] a rough ceiling, above which a finding of mental retardation in the capital context is precluded."  Ex parte Hearn, 310 S.W.3d at 430 (citing Ex parte Woods, 296 S.W.3d 587, 608 n. 35 & 36 (Tex.Crim.App. 2009); Williams v. State, 270 S.W.3d 112, 132 (Tex.Crim.App. 2008); Neal v. State, 256 S.W.3d 264, 273 (Tex.Crim.App. 2008); Hunter v. State, 243 S.W.3d 664, 671 (Tex.Crim.App. 2007); Gallo v. State, 239 S.W.3d 757, 771 (Tex.Crim.App. 2007); Ex parte Blue, 230 S.W.3d 151, 165 (Tex.Crim.App. 2007); Ex parte Lewis, 223 S.W.3d 372, 378 n. 21 (Cochran, J. concurring) (Tex.Crim.App.2006); Hall v. State, 160 S.W.3d

18

24, 36 (Tex.Crim.App. 2004); Briseño, 135 S.W.3d at 14 n. 53). It is not a federal habeas court's function to review a state's interpretation of its own law. Swarthout v. Cooke, — S.Ct. — , 2011 WL 197627 (January 24, 2011) at *2; Weeks v. Scott, 55 F.3d 1059, 1063 (5th Cir. 1995); Moreno v. Estelle, 717 F.2d 171, 179 (5th Cir. 1983). A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fair-minded jurists could disagree" on the correctness of that decision. And the more general the rule being considered, "the more leeway courts have in reaching outcomes in case-by-case determinations." Harrington v. Richter, 131 S.Ct. 770, 786 (2011), citing Yarborough, 541 U.S. at 664. Under § 2254(d), a habeas court must determine what arguments or theories could have supported the state court's decision, and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. Harrington, 131 S.Ct. at 786. It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

This is far from the first time a Texas court has required evidence of IQ scores in order to find an inmate to be retarded. For example, in 2007, the Court of Criminal Appeals held in Blue:

> . . . [W]ithout an IQ score that is indicative of significant
> sub-average intelligence, the only proof the applicant has offered is

his poor school performance, which Patton admits could be the
result of other factors. Without more compelling proof, we cannot
readily infer that the applicant's apparent adaptive deficits are
related to significant sub-average general intellectual functioning.
Such evidence, even inasmuch as it may support a strong suspicion,
nevertheless falls short of evidence that could reasonably support a
firm belief or conviction that the applicant is mentally retarded.

230 S.W.3d at 166.  Obviously, an inmate's IQ score can disqualify him from

Atkins protection.  While the Fifth Circuit has specified that "mental retardation

can be found in range of 70-75," Moore v. Quarterman, 342 F. App'x 65, 68 n.5

(5th Cir. 2009) (emphasis added), the Fifth Circuit has only granted relief on

Atkins claims where an inmate presents at least one base score below 70.[7]  The

Fifth Circuit has denied relief when an inmate has IQ scores both under and

---

[7]      See Moore v. Quarterman, 342 F. App'x 65, 68 (5th Cir. 2009) (finding
significantly subaverage intellectual functioning with IQ scores ranging from 66 to 76);
Rivera v. Quarterman, 505 F.3d 349, 361 (5th Cir. 2007) (finding mental retardation
with scores as low as 66).

over 70[8] and when all his scores fall above 70.[9]  Even when an inmate has scored

below 70, the Fifth Circuit has found no mental retardation if the circumstances

show that the inmate has exaggerated his deficits.[10]  In sum, it is fairly well

settled that "subaverage intellect . . . is typically established by looking to IQ

tests such as the Wechsler Adult Intelligence Scale (WAIS) and finding a score

of 70 or below." Thomas v.Quarterman, 335 F. App'x 386, 388 (5th Cir. 2009).

Requiring significantly subaverage general intellectual function as

measured in full-scale IQ scores is such a common factor when determining

retardation that it hardly merits debate.  In contrast, Hearn was able to find just

one California decision on the books—none in Texas—in which an inmate with

---

[8]        See Hall v. Thaler, 597 F.3d 746, 746-47 (5th Cir. 2010) (scores ranging
from 67 to 84); Thomas v. Quarterman, 335 F. App'x 386, 388-89 (5th Cir. 2009) (three
IQ tests scoring 67, 75, and 77); Rosales v. Quarterman, 291 F. App'x 558, 561 (5th Cir.
2008) (a pre-Atkins score of 82 and a post-Atkins scores of 61 and 73); Moore v.
Quarterman, 517 F.3d 781, 784 (5th Cir. 2008) (finding no mental retardation with
full-scale IQ scores of 63, 68, 72, 76, and 76); Morris v. Quarterman, No. 07-70012 (5th
Cir. Apr. 17, 2008) (pre-Atkins score of 97 and post-Atkins scores of 53 and 64); Perkins
v. Quarterman, 254 F. App'x 366, 369 (5th Cir. 2007) (scores ranging from 66 to 80);
Taylor v. Quarterman, 498 F.3d 306, 307-08 (5th Cir. 2007) (pre-Atkins score of 75 and
post-Atkins scores of 65 and 69); Woods v. Quarterman, 493 F.3d 580, 585-86 (5th Cir.
2007) (pre-Atkins scores of 78 and 80 and post-Atkins score of 68); Clark v.
Quarterman, 457 F.3d 441, 445-46 (5th Cir. 2006) (pre-Atkins score of 74 and post-
Atkins scores of 65 and 68).

[9]        See Pierce v. Thaler, ___ F.3d ___, 2010 WL 1532738, at *13 (5th Cir.
2010) (WAIS-III score of 70); Williams v. Quarterman, 293 F. App'x 298, 310-11 (5th
Cir. 2008) (three different IQ tests scoring a 70 or 71);Eldridge v. Quarterman, 325 F.
App'x 322, 325 (5th Cir. 2009) (scores ranging from 72 to 112).

[10]       See Moreno v. Dretke, 450 F3d 158, 165 (5th Cir. 2006) (post-Atkins score
of 64 with substantial testimony that it underestimated his abilities).

IQ scores over 75 was found to be retarded.  Brief, ECF No. 119, at 10-13.  As mentioned before, this California case dealt with statutory interpretation, a factor not present in the instant case.  Further, California's definition of retardation is not controlling in Texas.  The California legislature declined to establish a numeric cut-off for IQ scores when it framed its statute, which informed the appellate court when it held that emphasis should not be placed on full scale IQ scores over subscores (not, as Hearn implies, that IQ scores are to be ignored entirely.)  Vidal, 155 P.3d at 266.  Vidal does not stand for Hearn's proposition that a state is prohibited from defining retardation to include an IQ-score cut-off, nor that this definition must originate with the factfinder instead of the State to be constitutional.

Ironically, the clinical definitions of retardation referenced and indeed cited with approval by the Atkins Court completely disagree with the outlier opinion presented by Hearn.  While Dr. Greenspan suggests his approach for application by the courts, it is not the definition espoused in Texas.  Texas's definition is consistent with the approach of the Diagnostic and Statistical Manual, Fourth Edition (DSM-IV Tr.), the standard reference for psychiatrists and mental health professionals.  In it, doctors explain how to diagnose someone with MR, specifying:

> General intellectual functioning is defined by the intelligence
> quotient (IQ or IQ-equivalent) obtained by assessment with one or

> more of the standardized, individually administered intelligence
> tests. . . Significantly subaverage intellectual functioning is defined
> as an IQ of about 70 or below (approximately 2 standard deviations
> below the mean.)

DSM-IV Tr. at 41.  Hearn insists that "sometimes a person whose IQ has tested

above 70 may be diagnosed as mentally retarded."  Id. (citing Briseño, 135

S.W.3d at 7, n. 24).  Hearn seeks to twist the statistical concept of "margin of

error" into wholesale permission to label people with IQs very near the mean and

neurological deficits as "mentally retarded."  Brief, ECF No. 119, at 5; Ex parte

Hearn, 310 S.W.3d at 430.

This is illogical.  The APA explains that general intellectual functioning

is defined by one's intelligence quotient.  DSM-IV Tr. at 41.  True, brain damage

and neurological dysfunctions exist which do not cause decreased IQ scores, but

these types of impairment are by definition not mental retardation.  This is the

conclusive opinion of the vast majority of mental health professionals, and of

state laws.  Hearn is simply unable to cite any mainstream psychiatric or

medical reference which diagnoses mental retardation in individuals like Hearn

with IQs in the upper 80s and lower 90s.  See, e.g., Brief, ECF No. 119, at 8.

And while it is possible to diagnose someone as mentally retarded in the absence

of IQ scores (for example, where a language barrier precludes valid testing), as

Hearn acknowledges, there is no need to in this case. Id. at 9.

Further, using IQ scores where available heightens the reliability of the

decision calculus by creating an objective, brightline standard.  Dr. Greenspan transparently acknowledges the likelihood that subjective, standardless approaches such as his will be expanded with the explicit and hardly scientific goal of permitting inmates to establish their mental retardation claims.  Brief, ECF No. 119, at 7.  The dangers of such subjectivity and vagueness are made clear when Dr. Greenspan confesses to putting his finger on the scale, that he thinks "it is appropriate to change the operational criteria one uses to diagnose [mental retardation], in order to meet the spirit of the constitutive definition":

> The use of IQ scores are an attempt to create an illusion of scientific certainty in identifying a disorder whose causes and manifestations are often hidden and subtle. . . IQ scores [are] . . . merely an external manifestation of an underlying biological mechanism and a predictor of limitations in real-world functioning. . .  Typically, clinicians and government entities find it easier to "go by the book," but there are times when that results in a wrong and, possibly, unjust decision.

Mot. Vacate Judgment, ECF No. 100, at 4.

    C.    Hearn's argument is illogical and would unlimit Atkins.

If Dr. Greenspan is right and retardation is such a subtle and hidden disorder, then to turn courts, experts and juries loose without a definition is to court madness.  Further, Hearn's approach invites the very arbitrariness and inconsistency which the Eighth Amendment seeks to dispel from capital cases because every factfinder will be presented with variations on definitions, expert opinions and testimony and expected to write its own definition on this basis,

24

instead of having a definition originating in the law.

Whether applied to individuals with poor judgment and impulse control as a general proposition or to the specific facts of Hearn's case, the concerns in Atkins are inapposite. Hearn acknowledges that whatever his other neurological impairments, he does not suffer from reduced general intellectual functioning. Report, ECF No. 87 at 2, 7. In fact, he does not contest that his IQ at least falls between 87-93. Id. at 1-2. Consequently, his "mild neuropsychological deficit" did not hinder his contribution to the defense against capital murder charges or prevent his understanding of the repugnancy of his actions. Report, ECF No. 87 at 8; Atkins, 536 U.S. at 306.

Hearn insists that his impulsiveness and lack of response to social cues puts him at a psychological disadvantage when it comes to obeying the law's dictates, and this alone makes his death penalty cruel and unusual. Report, ECF No. 87 at 10-11. Actually, the facts of the crime indicate this was not a crime of sudden and uncontrollable impulse. However, the law provides alternative means to account for that by allowing defenses based on insanity or involuntary acts, and certainly nothing bars its consideration as mitigating evidence. The existence of "a mild neuropsychological deficit" is not analogous to the factors which caused the Supreme Court to find that the execution of a mentally retarded defendant may be cruel and unusual. See In re Neville, 440

25

F.3d 220,221 (5th Cir. 2006); In re Woods, 155 Fed.App'x. 132, 136 (5th Cir. 2005) (declining to grant a successive habeas petition to consider the defendant's alleged mental illness because Atkins does not cover mental illness).

Persons with mental retardation "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Atkins, 536 U.S. at 318. Using Hearn's logic, those who demonstrate by their behavior that they communicate poorly, do not learn from their mistakes, act illogically and on impulse, and seem to care not for the reactions of others should not be executed because they share characteristics with a mentally retarded person. Report, ECF No. 87 at 1-13. Hearn's attempt to reason backwards from Justice Stevens's words in Atkins would unlimit Atkins —Hearn and other murderers like him may have problems communicating, but not the way Justice Stevens and the medical community meant. Clearly, his acts are the results of impulses (an unlimited definition of "impulse" that includes intention, desire, planning, and will) and he does care very much for the reactions of others— just not in the way society would like. From the perspective of a non-criminal, normal person, every murderer displays those characteristics. Put bluntly, the characteristics he would like to blame on this "mild disorder" are typical of capital murderers and, instead of absolving

him of moral blameworthiness, are exactly what make him so deserving of the jury's verdict. Hearn's claim merits no relief from this Court.

   D.   An evidentiary hearing would be pointless.

   Even if a petitioner is not precluded by § 2254(e)(2)—as Hearn was not because this Court allowed him to fully develop his mental retardation claim—"that does not mean he is entitled to an evidentiary hearing—only that he may be." McDonald v. Johnson, 139 F.3d 1056, 1059-60 (5th Cir. 1998) (emphasis added). That is, "§ 2254(e)(2) specifies the situations where evidentiary hearings are allowed, not where they are required." Id. at 1060; see Murphy v. Johnson, 205 F.3d 809, 815 (5th Cir. 2000)("overcoming the narrow restrictions of § 2254(e)(2) does not guarantee a petitioner an evidentiary hearing, it merely opens the door for one").

   In deciding whether to conduct a hearing, a federal district court must consider whether the record is sufficient to allow review of the petitioner's claims. "[W]hen 'the district court ha[s] sufficient facts before it to make an informed decision on the merits of [the habeas petitioner's] claim' it does not abuse its discretion in failing to conduct an evidentiary hearing." Barrientes v. Johnson, 221 F.3d 741, 770 (5th Cir. 2000) (quoting McDonald v. Johnson, 139 F.3d 1056, 1060 (5th Cir. 1998)); see also Williams v. Taylor, 529 U.S. 420, 436 (2000)(stating that it was "Congress' intent to avoid unneeded evidentiary

hearings in federal habeas corpus"). Additionally, the Fifth Circuit "has consistently held that a petitioner is entitled to an evidentiary hearing only where a factual dispute, if resolved in his favor, would entitle him to relief." Murphy, 205 F.3d at 816; see Hicks v. Wainwright, 633 F.2d 1146, 1150 (5th Cir. Unit B 1981) ("An evidentiary hearing is necessary only when facts are at issue.").

In the instant application, Hearn contends that he made a prima facie showing of mental retardation and is thus entitled to an evidentiary hearing. Brief, ECF No. 119, at 15. But as discussed above, that is not the standard. And regardless, the record establishes quite the opposite: Hearn is not mentally retarded. He even conceded as much in a prior pleading. Report, ECF No. 87. Further, he has had several years and a surfeit of funds with which to fully develop his claim. Hearn consulted with five medical and psychological experts and had the benefit of tests and evaluations by two others, as well as quantities of records and documents related to his developmental phase. All of this was presented to this Court for its consideration and to the state court for its habeas proceeding.

Hearn confuses the deference owed a state court's factual findings with the greater, nearly jurisdictional, deference owed a state court's interpretation of its own law. Brief, ECF No. 119, at 15. "[I]t is not the province of a federal habeas

court to reexamine state-court determinations on state-law questions," unless they are so serious that they destroy the regularity of the trial as a whole. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990)("[F]ederal habeas corpus relief does not lie for errors of state law.") The facts regarding Hearn's IQ are undisputed.  Because the state court has definitively spoken on its definition of retardation and Hearn's position against the state court's decision is a purely legal argument, no further factual development is necessary.  Because Hearn has not demonstrated a factual dispute that requires further development at an evidentiary hearing, and the district court has sufficient facts before it to make an informed decision, Hearn is not entitled to an evidentiary hearing on this issue.  This Court would be well within its discretion to deny an evidentiary hearing.  Clark v. Johnson, 227 F.3d 273, 284-85 (5th Cir. 2000).

## CONCLUSION

For all the foregoing reasons, the Director respectfully asks that an evidentiary hearing be denied, summary judgment be granted and that Hearn's successive petition for writ of habeas corpus be denied.


Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

\*     /s/ Georgette P. Oden
GEORGETTE P. ODEN
Assistant Attorney General
\*Attorney-in-charge
State Bar No. 24029752

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1400
facsimile (512) 320-8132
Georgette.Oden@oag.state.tx.us

## CERTIFICATE OF INTERESTED PERSONS

I, Georgette P. Oden, do hereby certify, pursuant to Local Rule 3.1(f) of the Northern District of Texas that other than the Director and Petitioner, counsel for Respondent is unaware of any person with a financial interest in the outcome of this case.

/s/ Georgette P. Oden
GEORGETTE P. ODEN
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, Georgette P. Oden, Assistant Attorney General of Texas, do hereby

certify that a copy of this Response to Hearn's Briefing was electronically mailed to counsel for Hearn at NaomiTerr@aol.com and dick@burrandwelch.com today, February 10, 2011.


   /s/ Georgette P. Oden
GEORGETTE P. ODEN
Postconviction Litigation Division